UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RONNIE RUSH, | ) | |
| | ) | |
| Plaintiff, | ) | 12 C 8967 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| MacARTHUR FOUNDATION and HILL MECHANICAL OPERATIONS, | ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Ronnie Rush alleges in this suit that MacArthur Foundation and Hill Mechanical Operations violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by subjecting him to a racially hostile work environment and by retaliating against him for filing a charge of discrimination with the EEOC. Doc. 25. Defendants answered, Docs. 30, 32, and the parties engaged in discovery, Docs. 37, 44, 62, 65, 70. Defendants have separately moved for summary judgment. Docs. 82, 86. The motions are granted.

**Background**

Consistent with the local rules, Defendants each filed a Local Rule 56.1(a)(3) statement of undisputed facts along with their summary judgment motions. Docs. 85, 88. Despite having been served by Defendants with Local Rule 56.2 Notices, which explain in detail the requirements of Local Rule 56.1, Docs. 83, 90, Rush did not file a Local Rule 56.1(b)(3)(B) response to Hill's Local Rule 56.1(a)(3) statement. Rush's status as a *pro se* litigant does not excuse him from complying with Local Rule 56.1. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel"); *Coleman v.*

1

*Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x 642, 643 (7th Cir. 2011) ("Though courts are solicitous of pro se litigants, they may nonetheless require strict compliance with local rules."); *Wilson v. Kautex, Inc.*, 371 F. App'x 663, 664 (7th Cir. 2010) ("strictly enforcing Local Rule 56.1 was well within the district court's discretion, even though Wilson is a pro se litigant") (citations omitted); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) ("even *pro se* litigants must follow rules of civil procedure"). Given Rush's failure to file a Local Rule 56.1(b)(3)(B) response to Hill's Local Rule 56.1(a)(3) statement, the facts set forth in Hill's statement are deemed admitted. See N.D. Ill. L .R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880-81, 884 (7th Cir. 2012); *Parra v. Neal*, 614 F.3d 635, 636 (7th Cir. 2010); *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 393 (7th Cir. 2009); *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006); *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 943-44 (7th Cir. 2005); *Smith v. Lamz*, 321 F.3d 680, 682-83 (7th Cir. 2003).

Although Rush filed a Local Rule 56.1(b)(3)(B) response to MacArthur's Local Rule 56.1(a)(3) statement, Doc. 96, he asserts certain facts in his response brief, Doc. 98, that are not set forth in his Local Rule 56.1(b)(3)(B) response. Those facts are disregarded because facts may be considered on summary judgment only if they are presented in a compliant Local Rule 56.1 statement or response. *See Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (holding that the predecessor to Local Rule 56.1(b)(3) "provides the only acceptable means of … presenting additional facts to the district court"); *Bolden v. Barnes*, 2013 WL 5737359, at *2 (N.D. Ill. Oct. 22, 2013) (disregarding facts in the plaintiff's response brief that were not properly set forth in a Local Rule 56.1 statement or response); *Dunhill Asset Servs. III,*

*LLC v. Tinberg*, 2012 WL 3028334, at *3 (N.D. Ill. July 23, 2012) ("Under settled law, facts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion.") (internal quotation marks omitted); *Garner v. Lakeside Cmty. Comm.*, 2011 WL 2415754, at *1 n.1 (N.D. Ill. June 13, 2011) ("the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)[C] statement of additional facts"); *Curtis v. Wilks*, 704 F. Supp. 2d 771, 789 (N.D. Ill. 2010) ("Any facts plaintiffs assert in their response brief that were not included in their LR 56.1 submissions will not be considered."); *Byrd-Tolson v. Supervalu, Inc.*, 500 F. Supp. 2d 962, 966 (N.D. Ill. 2007) ("facts are properly presented through the framework of the Rule 56.1 statements, and not through citation in the briefs to raw record material").

Moreover, certain paragraphs of Rush's Local Rule 56.1(b)(3)(B) response assert facts that are not fairly responsive to the corresponding paragraphs of MacArthur's Local Rule 56.1(a)(3) statement. Doc. 96 at ¶¶ 11, 21, 25. Those facts will be disregarded because they are not set forth in a Local Rule 56.1(b)(3)(C) statement of additional facts; Rush did not file one. *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (holding that "Rule 56.1 envisions a separate statement of additional facts" and that non-responsive facts in a Local Rule 56.1(b)(3)(B) response "should have been included in a separate statement"); *Bolden v. Dart*, 2013 WL 3819638, at *2 (N.D. Ill. July 23, 2013) ("a non-movant seeking to assert facts that go beyond what is fairly responsive to the movant's factual assertions must do so not in his Local Rule 56.1(b)(3)(B) response, but in a Local Rule 56.1(b)(3)(C) statement of additional facts"); *Johnson v. Cnty. of Cook*, 2012 WL 2905485, at *12 (N.D. Ill. July 16, 2012) ("It is inappropriate for a non-movant to include additional facts, meaning facts extraneous to the substance of the paragraph to which the non-movant is responding, in a Local Rule 56.1(b)(3)(B)

response. Rather, Local Rule 56.1 *requires specifically* that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate statement under Local Rule 56.1(b)(3)(C) of any additional facts that require the denial of summary judgment.") (citations and internal quotation marks omitted). The court will also disregard those paragraphs of Rush's Local Rule 56.1(b)(3)(B) response that lack specific references to the record or that do not include a statement to the effect that Rush agrees with or denies MacArthur's assertions. Doc. 96 at ¶¶ 4, 6, 8, 10, 11, 23-24, 26, 28-29; *see Ammons*, 368 F.3d at 817-18 (holding that "where a non-moving party denies a factual allegation by the party moving for summary judgment, that denial must include a specific reference to the affidavit or other party of the record that supports such a denial," noting that "[c]itations to an entire transcript of a deposition or to a lengthy exhibit are not specific and are, accordingly, inappropriate"); *id.* at 818 (affirming the district court's decision to strike responses that gave no "indicati[on] that [the non-moving party] agrees with or denies the allegation [in the moving party's Local Rule 56.1 statement]"); *Erwin v. U.S. Dep't of State*, 2013 WL 6452758, at *1 (N.D. Ill. Dec. 9, 2013) (disregarding assertions in the plaintiff's Local Rule 56.1(b)(3)(B) response that failed to cite specific record material). Finally, the court deems admitted certain facts in MacArthur's Local Rule 56.1(a)(3) statement to which Rush altogether failed to respond. Doc. 96 at ¶¶ 13, 17; *see Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 937 (7th Cir. 2003) ("accepting as true the material facts submitted by Wal-Mart that Adams did not properly contest").

With all that said, the following facts are stated as favorably to Rush as the record and Local Rule 56.1 allow. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). Rush is an African-American man who was hired in 2001 as an operating engineer for the Marquette Building in Chicago, Illinois. Doc. 85 at ¶¶ 1, 16; Doc. 96 at ¶¶ 5, 7. MacArthur owns the

Marquette Building and is headquartered there. Doc. 96 at ¶ 5. MacArthur is a not-for-profit charitable foundation that makes grants "in a variety of programs, including juvenile justice, community development, affordable housing, conservation, human rights and international justice, maternal mortality, higher education, migration and public media." Doc. 85 at ¶ 3; Doc. 96 at ¶ 4.

In 2003, MacArthur retained L.J. Sheridan & Company to manage the Marquette Building. Doc. 85 at ¶ 17; Doc. 96 at ¶ 8. L.J. Sheridan's duties involved managing the operating engineers, including Rush. Doc. 96 at ¶¶ 9-10. A few years later, ABM Industries took over management of the building. Doc. 85 at ¶ 18; Doc. 96 at ¶ 11. On January 1, 2010, Hill assumed ABM Industries' management role. Doc. 85 at ¶ 19; Doc. 96 at ¶ 13. Hill is "a building engineering and operations company that provides operating engineers to industrial, residential, and medical buildings in the Northern District of Illinois." Doc. 85 at ¶ 2. MacArthur's "Operating Engineers and Maintenance Personnel Contract" with Hill, dated October 1, 2009, provides that Hill is "the sole employer of all employees placed by it at [the Marquette Building], and the relationship between Hill and the Foundation is solely that of independent contractors." Doc. 96 at ¶ 17.

Through these changes in management, Rush continued working as an operating engineer, though he had to submit job applications to each successor management company—first to ABM Industries, and then to Hill. *Id*. at ¶¶ 12, 15. After assuming management of the Marquette Building in 2010, Hill issued Rush paychecks as well as a W-2 form, an employee handbook, and applicable rules and regulations. Doc. 85 at ¶ 20; Doc. 96 at ¶¶ 15-16, 18. Hill was responsible for issuing disciplinary write-ups and performance evaluations to Rush. Doc. 96

5

at ¶ 19. Rush reported to Scott Hultgren and Jerry Meehan, Hill's Chief Operating Engineer and Assistant Chief Operating Engineer, respectively. Doc. 85 at ¶¶ 8-9, 21.

MacArthur took no part in hiring Rush to work in the Marquette Building, and nor was MacArthur responsible for the supervision, direction, or control of Rush's work as an operating engineer. Doc. 96 at ¶¶ 25-27. MacArthur did not determine or issue Rush's salary, hours, or benefits. *Id*. at ¶¶ 28-30. At all relevant times, Michael Curtis worked as the building manager for the Marquette Building, and was not employed by Hill. Doc. 85 at ¶¶ 11, 38.

On March 26, 2010, Rush filed an EEOC discrimination charge against MacArthur. *Id*. at ¶ 22; Doc. 96 at ¶ 20. Some time later in 2010, Rush filed an EEOC discrimination charge against Hill. Doc. 85 at ¶ 23. Rush then voluntarily withdrew both discrimination charges. *Id*. at ¶¶ 24-25. After withdrawing the charges, Rush did not have contact with any Hill employees except for Meehan, Hultgren, Harold Hacker (the Vice President of Operations), and Nassar Dollah (the Operations Manager). *Id*. at ¶¶ 5-7, 26.

On November 8, 2012, Rush filed this suit. Doc. 1. On January 24, 2013, Rush filed an EEOC charge against Hill for race discrimination and retaliation. Doc. 85 at ¶ 14. Rush claimed that in October 2012, Curtis "mumbled 'nigger' at [Rush] under his breath." Doc. 96 at ¶ 22. On February 11, 2013, the EEOC issued Rush a right-to-sue letter. Doc. 85 at ¶ 15.

On October 3, 2013, Hacker informed MacArthur that "effective October 2, 2013[,] Ron Rush is no longer employed with Hill Mechanical Operations" and that Hill was interviewing candidates to replace him. Doc. 96 at ¶ 23. MacArthur had no prior notice of Rush's termination and did not participate in the decision. *Id*. at ¶ 24. From 2010 to his termination, Rush did not experience any change in his job title or responsibilities, and nor did he lose any pay or undergo any discipline, suspensions, or demotions. Doc. 85 at ¶¶ 32-37; Doc. 96 at ¶ 21.

**Discussion**

Defendants have met their burden in demonstrating that they are entitled to judgment as a matter of law on both the hostile work environment and retaliation claims.

I.  **Claims Against MacArthur**

Title VII makes it "an unlawful employment practice for an *employer* … to … discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Title VII defines "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f). MacArthur seeks summary judgment on the ground that it was not Rush's employer. *See Robinson v. Sappington*, 351 F.3d 317, 332 n.9 (7th Cir. 2003) ("It is only the employee's employer who may be held liable under Title VII."); *Mays v. BNSF Ry. Co.*, __ F. Supp. 2d __, 2013 WL 4804839, at *2-3, 9-11 (N.D. Ill. Sept. 9, 2013) (explaining that "[o]nly an 'employer' can be held liable under Title VII," and that the plaintiff "can survive summary judgment only if a reasonable jury could find on this record that [the defendant] was his employer"). MacArthur is correct, as it indisputably was not Rush's employer for Title VII purposes. Doc. 96 at ¶ 25.

The Operating Engineers and Maintenance Personnel Contract between MacArthur and Hill provides that Hill is "the sole employer of all employees placed by it at [the Marquette Building]." *Id*. at ¶ 17. The contract also states that "the relationship between Hill and the Foundation is solely that of independent contractors." *Ibid*. The following factors govern whether an individual is an employee, and thus entitled to protection under Title VII, or an independent contractor, and thus outside the statute's scope: (1) "the extent of the employer's control and supervision over the worker"; (2) "the kind of occupation and nature of skill

required"; (3) "responsibility for the costs of operation"; (4) "method and form of payment and benefits"; and (5) "length of job commitment and/or expectations." *Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 438 (7th Cir. 1996). "Among these factors, the employer's right to control is the most important when determining whether an individual is an employee or an independent contractor." *Ibid*. (internal quotation marks omitted).

It is undisputed that MacArthur had no control over any aspect of Rush's employment, as it took no part in Hill's employee management or hiring activities. Doc. 96 at ¶¶ 25-28, 30. Rush filled out an employment application specific to Hill, received his paychecks and benefits from Hill, and was supervised and managed solely by Hill staff. *Id*. at ¶¶ 15-16, 18, 21. Thus, as a matter of law, MacArthur is not Hill's employer under Title VII, which entitles MacArthur to judgment. *See Alam v. Miller Brewing Co.*, 709 F.3d 662, 669 (7th Cir. 2013) (holding that the district court appropriately dismissed the plaintiff's Title VII claim where the defendant was not the plaintiff's employer for purposes of Title VII); *Geier v. Medtronic, Inc.*, 99 F.3d 238, 244 (7th Cir. 1996) (affirming summary judgment where the defendant "does not fall within Title VII's definition of employer"); *Williams v. Banning*, 72 F.3d 552, 553 (7th Cir. 1995) (affirming the district court's ruling that the defendant "could not be held liable under Title VII … because he did not independently meet Title VII's definition of 'employer'").

## II. Claims Against Hill

### A. Hostile Work Environment Claim

Of the facts that Local Rule 56.1 allows the court to consider on summary judgment, the only one that pertains to Rush's hostile work environment claim is that Curtis allegedly "mumbled 'nigger' at [Rush] under his breath" in October 2012. Doc. 96 at ¶ 22. Although Rush asserts in his response brief that certain false accusations were against him—specifically,

that Marge Boersema falsely asserted that "she has an order of protection on [Rush]" and that he stole her personal work file from her office, Doc. 98 at 1-2—the court will not consider those facts because they were not properly set forth in a Local Rule 56.1(b)(3) statement or response. Thus, Hill was entitled to base its hostile work environment argument solely on Curtis's alleged slur in October 2012. Instead, Hill's brief draws from the raw record—Rush's deposition testimony, Doc. 85-1—in raising and addressing three other alleged incidents that Rush claims caused a hostile work environment. Doc. 84 at 3-5. Those incidents are: (1) sometime in 2010, a security guard told Rush that Curtis tried to pay him (the security guard) to lie and to "say that [Rush] was doing something that [he] wasn't doing at the time," Doc. 85-1 at 20; (2) sometime after 2010, Curtis told Rush that "he had a video of [Rush] giving the fuck-you finger to a camera that records … in the fitness center, and he called Hill and when Hill got there, there was[] no tape," *id.* at 21; and (3) sometime after 2010, Curtis blamed Rush for dropping a barbecue chip on the floor and called Meehan and Hultgren to tell them, *id.* at 21-22. With Hill having opened the door, the court will consider those three other incidents.

"Title VII prohibits the creation of a hostile work environment." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013). To prevail on a hostile work environment claim, a "plaintiff must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered." *Ibid*. "To avoid summary judgment on a hostile work environment claim, a plaintiff must provide sufficient evidence to create a genuine issue of material fact as to four elements: (1) the work environment must have been both subjectively and objectively offensive; (2) [membership in a protected class] must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability." *Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014); *see also Milligan v.*

*Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 383 (7th Cir. 2012). The court need not address the first, second, or fourth elements, as Hill correctly argues that the hostile work environment claim fails because the conduct alleged cannot be deemed "severe or pervasive." Doc. 84 at 3-5.

To rise to the level of a hostile work environment, "the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (internal quotation marks omitted). "The factors that [the court] may consider in deciding whether the environment is hostile include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Ibid.* (internal quotation marks omitted). Rush "must show that [his] workplace was both objectively and subjectively hostile. … Unlike the subjective element, it is difficult to show that the harassment was *objectively* severe or pervasive." *Zayas v. Rockford Memorial Hosp.*, 740 F.3d 1154, 1159-60 (7th Cir. 2014) (internal quotation marks omitted).

The allegedly hostile incidents between 2010 and 2012 consist of Curtis attempting to pay a security guard to lie about Rush, Curtis telling Rush's superiors that Rush dropped a barbecue chip on the floor, Curtis falsely telling Hill that there was a video of Rush flipping off a security camera, and Curtis calling Rush a "nigger." Doc. 85-1 at 20-22; Doc. 96 at ¶ 22. The first three incidents, while petty and annoying, do not even come close, alone or together, to harassment that is so severe or pervasive as to alter the conditions of Rush's employment. In fact, there is no evidence that the security guard actually lied about Rush, or that Hill disciplined Rush upon hearing the unsubstantiated allegations that Rush flipped off a security camera and

dropped a barbeque chip on the floor.  *See Zayas*, 740 F.3d at 1156-57, 1160 (holding that the plaintiff's "short and exhaustive list of [ten] allegedly hostile occurrences over her long employment at the Hospital" were not "objectively severe enough to survive summary judgment," where the plaintiff alleged in part that she was singled out in company meetings, a co-worker "almost got physical with her" and told her she should quit, and another co-worker posted a poem about "firing trouble" above her locker).

The fourth alleged incident—Curtis calling Rush a "nigger"—is highly reprehensible.  But the Supreme Court has held that the "mere utterance of an … epithet which engenders offensive feelings in an employee … does not sufficiently affect the conditions of employment to implicate Title VII."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted).  "One utterance alone does not create an objectively hostile work environment."  *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004); *Ngeunjuntr v. Metropolitan Life Ins. Co.*, 146 F.3d 464, 468 (7th Cir. 1998) (same, where the plaintiff's manager told the plaintiff, who is Thai and a Buddhist, to "go back East," reasoning that "[t]he comment is inappropriate, but isolated"); *cf. Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) (holding that the harassment was severe or pervasive where an African-American plaintiff was "repeatedly subjected to hearing the word 'nigger,' including more than one occasion in which a fellow supervisor suggested that he talk to an employee 'nigger to nigger'"); *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (same, where a supervisor used the word "nigger" twice in the plaintiff's presence, told the plaintiff's African-American sales agents, "You black guys are too fucking dumb to be insurance agents," informed the plaintiff that the company vice president advised against hiring any African-American sales agents, and told the plaintiff, "You must think you're back in Arkansas chasing jackrabbits"); *Daniels v. Essex Grp.,*

*Inc.*, 937 F.2d 1264, 1274 (7th Cir. 1991) (same, where the plaintiff, the only African-American in the office, was "the victim of racial taunts such as the nickname 'Buckwheat,'" was subjected to repeated instances of restroom graffiti stating "KKK" and "All niggers must die," and found a black dummy hanging in his office doorway, reasoning that "[u]nlike other cases where a relatively small number of racial incidents has been found to be inadequate to give rise to Title VII liability, … here each of the incidents was directed personally at [the plaintiff] over the course of a few months"); *Hallmon v. Sch. Dist. 89*, 911 F. Supp. 2d 690, 706 (N.D. Ill. 2012) ("a reasonable jury could find that the two incidents where Annis called Hallmon 'nigger' and other slurs, together with Hallmon's hearing the term used by white teachers on other occasions," made an objectively hostile work environment). The one instance in which Curtis "mumbled 'nigger' at [Rush] under his breath," Doc. 96 at ¶ 22, as deplorable as it is, does not amount to severe or pervasive harassment. Even when the slur is considered alongside the three other alleged hostile incidents—which add very little, if anything, to the calculus—the record would not allow a reasonable jury to hold for Rush on his Title VII hostile work environment claim. *See Ngeunjuntr*, 146 F.3d at 467 ("the problem with [the plaintiff's] case is that even if we were to interpret each of the comments and actions alleged as evidence of hostility or discrimination, given the totality of the circumstances we would have to conclude that the evidence presented does not reveal an environment sufficiently hostile that a reasonable person would find it abusive, even if [the plaintiff] himself did").

### B. Retaliation Claim

"Title VII prohibits an employer from taking an adverse employment action against an employee because [he] has filed an employment discrimination charge." *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 740 (7th Cir. 2011). A plaintiff "may defeat a motion

12

for summary judgment by providing sufficient evidence of retaliation through either a direct or indirect method." *Ibid.*; *see Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012). Rush fails under both methods.

"To avoid summary judgment under the direct method of proof for proving retaliation, a plaintiff must show: (1) that [he] engaged in a statutorily protected activity; (2) that [he] suffered a materially adverse action by [his] employer; and (3) there was a causal link between the two." *Silverman*, 637 F.3d at 740; *see Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010). It is undisputed that Rush engaged in a statutorily protected activity by filing an EEOC charge in 2010, and the record also shows that Hill took an adverse employment action against Rush when it terminated him on October 2, 2013. Doc. 96 at ¶ 23. The problem is that there is no evidence of a causal link between the filing of the charge and the termination three years later.

A plaintiff can demonstrate "causation by showing that [his] complaints and EEO filings were a substantial or motivating factor in the [employer's] decisions to … fire [him]." *Coleman*, 667 F.3d at 860 (internal quotation marks omitted). "This may be done via direct evidence, which would entail something akin to an admission by the employer ('I'm firing you because you had the nerve to accuse me of sex discrimination!'). It may also be done by presenting a convincing mosaic of circumstantial evidence that would permit the same inference without the employer's admission." *Ibid*. (citations and internal quotation marks omitted). Direct evidence is lacking, so the court turns to circumstantial evidence. As the Seventh Circuit has explained:

> [W]e have recognized three categories of circumstantial evidence available to a plaintiff using the 'convincing mosaic' approach. One includes suspicious timing, ambiguous statements oral or written, … and other bits and pieces from which an inference of [retaliatory] intent might be drawn. Another is evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently. Another type is evidence that the employer offered a pretextual reason for an adverse employment action. Each type of evidence is sufficient by itself (depending of course on its strength in

13

>relation to whatever other evidence is in the case) to support a judgment for
>the plaintiff; or they can be used together.

*Ibid*. (citations and internal quotation marks omitted).

Rush has not offered evidence under any of these three categories. The record indisputably shows that three years passed between the time of Rush's 2010 EEOC filing and his termination in 2013, and that during this time, Rush had not experienced any change in his job responsibilities or pay and did not suffer from disciplinary actions of any kind. Doc. 85 at ¶¶ 32-37; Doc. 96 at ¶ 21. Rush does not put forth any evidence as to the treatment of similarly situated employees. Tellingly, at no point does Rush assert that he was fired as a result of having filed his 2010 EEOC charge. Rather, Rush points to the four allegedly hostile occurrences mentioned above as the retaliatory conduct he faced for filing his 2010 EEOC charge. Because the inquiry focuses on whether the plaintiff suffered a materially adverse action by his *employer*, the court must look at retaliatory actions that Hill, as opposed to Curtis, took against Rush. (It is undisputed that Curtis was not employed by Hill. Doc. 85 at ¶¶ 11, 38.) As the court already noted, there is nothing in the record indicating that Hill took any adverse action in response to Curtis's reports that Rush flipped off a security camera or dropped a barbeque chip, and nor is there evidence that Hill had any involvement with Curtis's interactions with the security guard or his use of a racial slur against Rush. There are simply no facts from which the court could draw an inference of retaliatory intent on Hill's part, let alone conclude that Rush's 2010 EEOC complaint motivated Hill to fire him three years later. Thus, Rush cannot succeed on his retaliation claim under the direct method.

Rush fares no better under the indirect method. This method requires that "plaintiffs … first make out a prima facie case of discrimination, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), which has four elements: they must demonstrate that (1) they are members

of a protected class; (2) they were meeting their employer's legitimate expectations; (3) they suffered an adverse employment action; and (4) at least one similarly situated employee, not in their protected class, was treated more favorably." *Alexander*, 739 F.3d at 979. There is no evidence in the record showing that Rush had met Hill's legitimate expectations, or that at least one similarly situated employee who had not filed an EEOC charge received more favorable treatment. Accordingly, because Rush's retaliation claim fails under both the direct and indirect methods, it cannot withstand summary judgment.

## Conclusion

For the foregoing reasons, Defendants' summary judgment motions are granted. With all claims resolved, judgment will be entered in favor of Defendants and against Rush, and the case will be closed.

May 6, 2014

United States District Judge